[Cite as *Hawk v. Stocklin*, 2014-Ohio-2335.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

MICHAEL W. HAWK, ET AL.,

    PLAINTIFFS-APPELLANTS,

    v.                                  CASE NO.  1-13-56

B.J. STOCKLIN,

    DEFENDANT-APPELLEE,
    -and-

HARRY LARSCHIED, D.B.A.,           O P I N I O N
HARRY'S HIDE A WAY & PATIO,

    DEFENDANT-APPELLANT.

---

Appeal from Allen County Common Pleas Court
Trial Court No. CV 2012 0448

Judgment Reversed and Cause Remanded

Date of Decision:   June 2, 2014

---

APPEARANCES:

    *Michael A. Rumer*  for Appellants Hawk, et al.

    *Robert B. Fitzgerald*  for Appellant, Harry Larschied, D.B.A., Harry's
    Hide A Way & Patio

    *Michael M. Neltner*  for Appellee, Cincinnati Specialty Underwriters
        Insurance Company

**SHAW, J.**

{¶1} Plaintiffs-appellants, Michael W. Hawk ("Michael"), Thomas M. Hawk, co-guardian of Michael W. Hawk, and Nancy Hawk, co-guardian of Michael W. Hawk (collectively referred to as the "Hawks"), and defendant-appellant Harry Larschied ("Larschied"), individually and dba Harry's Hide A Way & Patio, appeal the October 9, 2013 judgment of the Allen County Court of Common Pleas granting a motion for summary judgment filed by intervening plaintiff-appellee, Cincinnati Specialty Underwriters Insurance Company ("CSU").

{¶2} This case arises out of an altercation between Michael and an individual named B.J. Stocklin ("B.J.") on December 14, 2011.

{¶3} For approximately five years, B.J. worked at Harry's Hide A Way, a bar owned and operated by Larschied. Harry's Hide A Way's hours of operation were from 7:00 p.m. to 2:30 a.m, Monday through Saturday. During the day, B.J. performed general maintenance and custodial tasks to prepare the bar to be open for business. At night, B.J. worked as the bar's security. B.J. explained that he did not have a set number of hours that he worked at night. Rather, he typically arrived to the bar when it opened at 7:00 p.m. to make sure all the people scheduled to work security had appeared. If they had not, B.J. clocked in and worked. However, if the bar was properly staffed, B.J. did not clock in but still

remained on the premises throughout the night to ensure that everything ran smoothly. B.J. and other security personnel considered him to be the head of security at Harry's Hide A Way. B.J. recalled that he worked nearly every day and night during the year of 2011.

{¶4} On the night of December 14, 2011, B.J. arrived at 7:00 p.m. when Harry's Hide A Way opened. B.J. wore an orange shirt with "Harry's Hide A Way" and "Security" written across the front. B.J. did not clock in right away because he did not know at that point if he would be needed for security. Instead, he assisted the members of the rap/hip-hop band slated to perform there that night by helping them set up their equipment. Not long after B.J., Andrew Garrett, the security person scheduled to work that night arrived. Andrew also wore an orange security shirt. Approximately forty minutes after the bar opened, business was slow and B.J. and Andrew decided to play a game of pool. Around this time, Michael arrived to the bar with his family and friends.

{¶5} Witnesses at the bar observed Michael mocking the rap/hip-hop band on the stage and loudly stating racial epithets regarding the genre of music. B.J. also observed Michael grab the chalk from one of the pool tables being used by other patrons and take it to the table where he was playing. B.J. asked the other patrons if they were still using the chalk. The other patrons indicated that they were not finished with their game and B.J. approached Michael about taking the

chalk. According to B.J.'s recollection of the events, Michael became loud and belligerent and confronted B.J. Michael stood nose to nose with him and said "You don't want to fuck with me, Mother Fucker, I've got all my boys with me." (Doc. No. 40 at 38). Michael also threatened to "whoop [B.J.'s] ass." (Id.). B.J. claimed he was turning to walk away from the altercation when he saw Michael raise his right hand in a fist as if to strike B.J. B.J. quickly turned back around and punched Michael one time in his lower left jaw, causing Michael to fall backwards to the floor. Realizing that he had broken a finger and fearing an escalation of events, B.J. immediately left the bar after the incident. Michael suffered serious physical injury to his head, which required him to be hospitalized for a significant period of time.

{¶6} On June 1, 2012, the Hawks initiated this civil action against B.J. and Larschied, seeking compensatory and punitive damages. B.J. and Larschied separately filed responses to the Hawks' complaint. Both Larschied and B.J. pled in their answers that B.J. punched Michael in self-defense.

{¶7} On July 16, 2012, in case CV 2012 0572, CSU filed a complaint for a declaratory judgment, requesting the trial court to determine pursuant to its policy issued to Larschied what insurance coverage, if any, it owed to Larschied and B.J. arising out of the Hawks' lawsuit.

{¶8} The trial court subsequently granted a motion filed by CSU to consolidate the two cases under the original case number assigned to the Hawks' personal injury case, CV 2012 0448.

{¶9} The case proceeded to the discovery phase and several depositions were taken, including those of Michael, B.J., and other individuals present at Harry's Hide A Way that evening. Michael had no memory of his altercation with B.J. B.J. maintained that he had acted in self-defense when he struck Michael, and no other witness observed the interaction between the two men leading up to Michael's injury.

{¶10} On July 3, 2013, CSU filed a motion for summary judgment arguing that under the terms of its insurance agreement with Larschied it had no duty to defend or indemnify Larschied or B.J. due to specific exclusions from coverage stated in the agreement. Larschied and the Hawks each filed memorandums contra to CSU's motion for summary judgment. CSU replied to each party's memorandum respectively.

{¶11} On October 9, 2013, the trial court granted CSU's motion for summary judgment and determined that Michael's injury was excluded from coverage. Specifically, the trial court relied on two provisions in the insurance agreement and found that reasonable minds could only conclude that the claim for

bodily injury arose from an actual battery and was expected or intended and was therefore excluded from coverage under the policy. (Doc. No. 80 at 7).

{¶12} The Hawks and Larschied each filed a notice of appeal, asserting the following assignments of error.

### THE HAWK'S ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED WHEN IT DETERMINED THAT NO AMBIGUITY EXISTED IN THE CSU INSURANCE POLICY FOR "BODILY INJURY . . . EXPECTED OR INTENDED FROM THE STANDPOINT OF THE INSURED" AND CONCLUDED THE ASSAULT OR BATTERY EXCLUSION IN THE ENDORSEMENT SET FORTH IN FORM CSGA301 01 08 NEGATES CSU'S DUTY TO DEFEND OR INDEMNIFY FOR AN ASSAULT OR BATTERY.**

### THE HAWK'S ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED WHEN IT FOUND "THAT REASONABLE MINDS COULD ONLY CONCLUDE THAT CLAIMS ARISING OUT OF BODILY INJURY THAT AROSE FROM ACTUAL BATTERY AND THAT WERE EXPECTED OR INTENDED ARE EXCLUDED FROM COVERAGE UNDER THE POLICY" AND GRANTED SUMMARY JUDGMENT TO CSU WHEN THE TOTALITY OF THE CIRCUMSTANCES AND EVIDENCE CONSIDERED UNDER CIV. R. 56 STANDARDS IN THE MOST FAVORABLE LIGHT OF THE PLAINTIFF AND THE INSURED REQUIRES THE MOTION BE DENIED.**

### LARSCHIED'S ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED IN GRANTING THE PLAINTIFF/APPELLEE'S MOTION FOR SUMMARY JUDGMENT WHEN IT RULED THAT THE ASSAULT OR BATTERY ENDORSEMENT "CLEARLY MODIFIES THE POLICY TO EXCLUDE ANY CLAIM ARISING OUT OF**

**BODILY INJURY EXPECTED OR INTENDED AND REMOVED THE SELF-DEFENSE EXCEPTION" AND CONCLUDED THAT THE ASSAULT OR BATTERY ENDORSEMENT NEGATED ANY DUTY OF THE CINCINNATI SPECIALTY UNDERWRITES INSURANCE COMPANY TO DEFEND OR INDEMNIFY THE DEFENDANT/APPELLANT IN THIS CASE.**

**LARSCHIED'S ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED IN FINDING THAT THERE WAS NO AMBIGUITY IN THE LANGUAGE OF THE ASSAULT OR BATTERY ENDORSEMENT AND DETERMINED THAT THE SAME NEGATED ANY DUTY OF THE CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY TO DEFEND OR INDEMNIFY THE DEFENDANT/APPELLANT IN THIS CASE.**

**LARSCHIED'S ASSIGNMENT OF ERROR NO. III**

**THE TRIAL COURT ERRED IN FINDING THAT THERE WERE NO ISSUES OF MATERIAL FACT AND THEREFORE DETERMINED THAT CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY WAS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW.**

{¶13} Due to their interrelated nature and for ease of discussion, we elect to discuss the assignments of error together.

{¶14} The Hawks and Larschied argue that the trial court erred in concluding that the insurance agreement between CSU and Larschied excluded coverage for Michael's injury. Specifically, The Hawks and Larschied maintain that the trial court misconstrued certain provisions of the insurance agreement in

determining that no coverage existed in granting CSU's motion for summary judgment.

{¶15} Before we address the specific arguments raised on appeal, it is necessary to discuss the particular provisions of the insurance agreement at issue.

{¶16} The "Commercial General Liability Coverage Form," also referred to as the "Policy," consists of sixteen pages and explains the duties CSU owes to its insured. Section I of the Policy entitled "Coverage A-Bodily Injury And Property Damage Liability" sets forth the following exclusion from coverage, together with a single exception to the exclusion.

> **2. Exclusions**
> **This insurance does not apply to:**
>
> **(a) Expected Or Intended Injury**
> **"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.** *This exclusion does not apply to bodily injury resulting from the use of reasonable force to protect persons or property.*[1]

(Policy at 2). (Emphasis added.)

The Policy defines "an Insured" in the following manner.

> **SECTION II-WHO IS AN INSURED**
>
> **1. If you are designated in the Declarations as:**

---

[1] The Policy states that " 'Bodily Injury' means bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time." (Policy at 13).

Case No. 1-13-56

> **(a)  An individual, you and your spouse are insured, but only with respect to the conduct of a business of which you are the sole owner.**[2]
>
> **\* \* \***
>
> **2.    Each of the following is also an insured:**
>
> **(a)  Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees," other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business \* \* \*.**[3]

(Id. at 9).  Also included as appendices to the Policy are over *forty* pages of "endorsements" that purport to add new provisions as well as modify, delete, and replace provisions of the original sixteen-page Policy.  The "endorsement" at issue in this case, referred to as the "Assault or Battery Endorsement," provides as follows:

---

[2] The Declarations page of the Policy identifies Larschied as an "Individual" form of business.

[3] The Policy states that a " 'Volunteer Worker' means a person who is not your 'employee,' and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you."  (Id. at 15).

An " 'Employee' includes a 'leased worker.'  'Employee' does not include a 'temporary worker.' " (Id. at 13).

A " 'Leased worker' means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business.  'Leased worker does not include 'temporary worker.' "  (Id. at 14).

A " 'Temporary worker' means a person who is furnished by you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions."  (Id. at 15).

## EXCLUSION—ASSAULT OR BATTERY

**This endorsement modifies insurance provided under the following:**

**COMMERICAL GENERAL LIABLITY COVERAGE FORM**

**A. The following exclusion is added to Paragraph 2., Exclusions of Section I-Coverage A-Bodily Injury And Property Damage and Paragraph 2., Exclusions of Section I-Coverage B-Personal And Advertising Injury Liability:**

**(a) This insurance does not apply to "bodily injury," "property damage" or "personal and advertising injury" arising out of:**

**(1) An actual or threatened assault or battery whether caused by or at the instigation or direction of any insured, their employees, patrons and any other person;**

**(2) The failure of any insured or anyone else for whom any insured is legally responsible to prevent or suppress assault or battery; or**

**(3) The negligent:**

**(a) Employment;**

**(b) Investigation or reporting or failure to report any assault or battery to proper authorities;**

**(c) Supervision;**

**(d) Training;**

**(e) Retention;**

**of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by paragraph a. above.**

**B. For the purpose of this endorsement the words assault and battery are intended to include, but are not limited to, sexual assault.**

**C. Exclusion, 2.a. of the Commercial General Liability Coverage Form is deleted in its entirety and replaced by the following:**

**2. a. Expected Or Intended Injury**
**"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.**

(Form CSGA301 01 08).

{¶17} Notably not included in the replacement language of Section C. 2.a. above is the second sentence from Paragraph 2.a. of the original Policy set forth earlier, which stated: "This exclusion does not apply to 'bodily injury' resulting from the use of reasonable force to protect persons or property." (Policy at 2).

{¶18} In its judgment entry granting CSU's motion for summary judgment the trial court noted the parties did not dispute the fact that B.J. intentionally hit Michael, examined the language of the provisions quoted above, and reached the following conclusions:

> **The endorsement in [CSU's] policy unambiguously stated that the insurance did not apply to *"bodily injury" arising out of an actual or threatened assault or battery*. The endorsement also unambiguously provided the "*Exclusion 2.a. of the Commercial General Liability Coverage Form is* <u>deleted in its entirety and replaced</u>…" By its clear terms, the endorsement provided that the insurance did not apply to *"bodily injury" arising out of an actual or threatened assault or battery expected or intended from the standpoint of the insured*. [CSU] pointed to evidence that**

-11-

> **[B.J.] intentionally hit [Michael] and there is no evidence that creates a genuine issue of fact as to whether [B.J.] actually battered [Michael].**
>
> **The assault-and-battery exclusion in the endorsement obviated any duty on the part of the insurer to defend against or to cover any damages that arose from an altercation at Harry's Hide A Way.**
>
> **\* \* \***
>
> **Under the clear language of the policy's endorsement exclusions, [CSU] did not have a duty to cover or defend against suits to which the insurance did not apply, and it follows that [CSU] is entitled to summary judgment in its favor. There is only one reasonable interpretation. The endorsement in [CSU's] policy unambiguously stated that the insurance did not apply to [Michael's] alleged bodily injury that arose from the undisputed actual battery. While the first 2.a. exclusion found in the main body of the insurance policy did not apply to bodily injury resulting from the use of reasonable force to protect persons or property (self-defense) the endorsement clearly modifies the policy to exclude any claim arising out of the bodily injury expected or intended and removed the self-defense exception. The endorsement specifically notified the insured that the endorsement form changed the policy. The Court finds that reasonable minds could only conclude that claims arising out of bodily injury that arose from actual battery and that were expected or intended are excluded from coverage under the policy. There is no ambiguity. Absent an ambiguity, the words of the policy must be given their plan [sic] and ordinary meaning.**

(Doc. No. 80 at 6-7) (Internal citations omitted) (Emphasis sic).

{¶19} This Court reviews a grant of summary judgment de novo, without any deference to the trial court. *Conley–Slowinski v. Superior Spinning & Stamping Co.*, 128 Ohio App.3d 360, 363, (1998). A grant of summary judgment

-12-

will be affirmed only when the requirements of Civ.R. 56(C) are met. This requires the moving party to establish: (1) that there are no genuine issues of material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party, said party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); see *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 1995–Ohio–286, paragraph three of the syllabus.

**{¶20}** The party moving for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." *Mitseff v. Wheeler*, 38 Ohio St.3d 112, syllabus (1988). The moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 1996–Ohio–107. Once the moving party demonstrates that he is entitled to summary judgment, the burden shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. *See* Civ.R. 56(E).

**{¶21}** An insurance policy is a contract and the relationship between the insurer and the insured is purely contractual in nature. *Nationwide Mut. Ins. Co. v. Marsh*, 15 Ohio St.3d 107, 109 (1984). The interpretation and construction of insurance policies is a matter of law to be determined by the court using rules of

construction and interpretation applicable to contracts generally. *Gomolka v. State Auto. Mut. Ins. Co*., 70 Ohio St.2d 166, 167–168 (1982). In insurance policies, as in other contracts, words and phrases are to be given their plain and ordinary meaning unless there is something in the contract which would indicate a contrary intention. *Olmstead v. Lumbermen's Mut. Ins*. Co., 22 Ohio St.2d 212, 216 (1970). Where the provisions of an insurance policy are clear and unambiguous, courts may not indulge themselves in enlarging the contract by implication in order to embrace an object distinct from that contemplated by the parties. *Nationwide Ins. Co. v. Tobler*, 80 Ohio App.3d 560, 564 (12th Dist.1992). However, where the provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured. *King v. Nationwide Ins. Co*., 35 Ohio St.3d 208 (1988), paragraph one of the syllabus.

{¶22} On appeal, the Hawks and Larschied argue that the trial court erred in determining that no ambiguity existed between the terms of the original Policy exclusion for an "expected or intended injury" with the "self-defense exception" and the subsequently added "Assault or Battery Endorsement." They also contend that the trial court erred in concluding that the "Assault or Battery Endorsement" clearly negated any duty on CSU's part to defend or indemnify B.J. and/or Larschied. Specifically, the Hawks and Larschied assert that the trial court erred

in concluding as a matter of law that B.J. committed a "battery" against Michael despite the evidence to support B.J.'s claim that he acted in self-defense.

{¶23} For its part, CSU argues that the trial court correctly determined that the "Assault or Battery Endorsement" modified the Policy: (1) by adding an exclusion for a bodily injury arising out of an actual or threatened assault or battery; and (2) by deleting the "self-defense exception" from the original "expected or intended injury" exclusion in the Policy. CSU maintains that under the terms of the "Assault or Battery Endorsement," the Policy it issued to Larschied "assumes that CSU will accept liability for ordinary negligence on the tavern premises (not connected with an assault or battery) but not for bar fights, i.e., assaults or batteries on those same premises." (Answer Brief to the Hawks' Appellate Brief at 12). At oral argument, attorneys for CSU maintained that other than possibly a slip and fall situation, this "bar-owners" Policy is not intended to cover injuries arising from any form of human interaction in the bar. Thus, CSU contends that the trial court properly concluded that the Policy excludes coverage of Michael's injury due to the fact that the injury was sustained as a result of an assault and/or battery despite B.J.'s claim that he hit Michael in self-defense.

{¶24} At the outset, we note that this Policy was apparently sold to the bar owner in its present form and thus did not involve a situation where an existing policy owned by the bar owner was subsequently amended with this endorsement.

Clearly, if CSU wanted to delete a significant provision of coverage from the original Policy, it could have simply removed that language from the original Policy prior to selling it to this bar owner. Instead, CSU chose to leave intact the original exception to the exclusion and add on an endorsement, among forty pages of other endorsements, which in a rather complicated and cumbersome way, added language, modified language, and deleted language in order to eliminate the coverage provision (the exception to the exclusion) still set forth in the original Policy. As such, we have some concern as to whether this manner of "deleting" a category of coverage involving the reasonable use of force in self-defense, which might clearly be significant to a bar owner purchasing such insurance, does not itself create unnecessary confusion, if not inherent ambiguity in this Policy, at least when sold to a new customer in this form. Nevertheless, for the reasons below, it is not necessary for us to address further or rely upon this concern in any way in reaching our decision.

{¶25} The construction of the Policy language advanced by CSU and relied upon by the trial court is founded upon the premise that any intentional act of force herein constitutes an "assault" and/or "battery" under the law. However, this premise erroneously blurs the critical distinction between an "intentional act"—a mere *factual description of one's conduct*, and an "assault" and/or "battery"— terms which denote a *conclusion of law pertaining to conduct determined to be*

*wrongful*, i.e., an "intentional tort." This distinction also carries a significant impact upon the proper construction of the Policy language of the endorsement in this case pertaining to "bodily injury * * * expected or intended from the standpoint of the insured."

**{¶26}** This distinction has been explicitly recognized by the Supreme Court of Ohio in a decision directly relevant to the case before us. In *Preferred Mutual Ins. Co. v. Thompson*, 23 Ohio St.3d 78 (1986), the Court addressed the issue of whether an insurance company could refuse to defend an insured against intentional tort claims of a third party when the insured claimed he injured the third party while acting in self-defense. The insurance company in *Thompson* argued that the third party's injury was excluded under a provision in the insurance agreement that precluded coverage for "bodily injury * * * which is either expected or intended from the standpoint of the insured." *Thompson* at 79. Notably, this language is identical to the "expected or intended injury" exclusion included in CSU's insurance agreement with Larschied.

**{¶27}** The Court in *Thompson* concluded that "neither the purpose behind the exclusion nor public policy is served by application of the exclusion to an insured who claims to have acted in self-defense." *Id*. at 81. Specifically, the Supreme Court reasoned that:

> **Generally, an individual may not purchase liability insurance coverage against a claim arising from his intentional infliction of**

**injury upon the person or property of another. Allowing the purchase of such coverage would remove an important disincentive to the commission of intentional torts—the resultant threat, through civil damage claims, to the tortfeasor's personal assets. No purpose is served, however, by denying coverage to an insured who, while acting in self-defense, intentionally injures another. The insured who acts in self-defense does so only as a *reaction* to his attacker, and any injuries suffered by the attacker are not the result of the insured's misconduct. [Emphasis sic].**

**From the standpoint of an insurance company, an "expected or intended injury" exclusion prevents individuals from purchasing insurance as a shield for their *anticipated intentional misconduct*. [Emphasis sic]. Without such an exclusion, an insurance company's risk would be incalculable. *An act of self-defense, however, is neither anticipated nor wrongful from the standpoint of the insured*. [Emphasis added]. The risk that an insurance company bears in providing an intentional tort defense for an insured who claims to have acted in self-defense is calculable and, from a monetary standpoint, minimal.**

**\* \* \***

**When an insured admits that he intentionally injured a third party and the surrounding circumstances indicate that he acted in self-defense in causing the injury, the insured's insurance company may not refuse to defend the insured from the third party's intentional tort claim on the grounds that the third party's injuries fall within an exclusion from coverage for "bodily injury \* \* \* which is either expected or intended from the standpoint of the [i]nsured."**

*Thompson*, 23 Ohio St.2d 78, 81-82.

{¶28} While the Court in *Thompson* only addressed an insured's claim of self-defense with respect to an "expected or intended injury," the Court's analysis is equally instructive in determining whether an insured's claim of self-defense is

excluded under the "Assault or Battery Endorsement" at issue in this case. First, we note that there is a genuine issue of material fact as to whether B.J. is an "insured" under the Policy. Based upon the depositions submitted in this case, it is unclear whether B.J. was an employee acting within the scope of his employment or performing duties related to the conduct of Larschied's business at the time Michael's injuries occurred. (*See* Policy at 9).

{¶29} Second, CSU's Policy does not define the terms "assault" and "battery" used in the endorsement. Therefore, the terms must be given their plain and ordinary meaning. The terms "assault" and "battery" carry a specific legal connotation pertaining to conduct constituting intentional torts meaning that a wrongful threat or a wrongful use of force has occurred. Accordingly, if B.J. is determined to have acted in self-defense when he intentionally punched Michael, then B.J.'s use of force was not wrongful under the law, did not constitute a "battery," and Michael's injury did not arise from "an actual battery" as the trial court found in its judgment entry.

{¶30} We note that CSU argues in its brief that it is inconsequential whether B.J. is deemed to have actually committed a battery against Michael because Michael "assaulted" B.J. prior to B.J. punching him, and the "Assault or Battery Endorsement" excludes any "bodily injury * * * arising out of an actual or threatened assault." However, CSU's argument does not account for the fact that

Michael's conduct provoking B.J.'s use of force does not have to rise to the level of an "assault"—and, in fact, there is no legal requirement that it do so—in order for B.J. to be entitled to act in self-defense. All that is required is that B.J. was not at fault in creating the situation giving rise to the affray and that B.J. had reasonable grounds to believe, *even if mistaken*, that he was in imminent danger of bodily harm. *See* 2 OJI-CR 421.21.

{¶31} Thus, for purposes of B.J.'s claim of self-defense, it is not necessary for a trier of fact to first determine if Michael actually committed an "assault" before deciding whether B.J. had a legitimate reason to believe he was threatened with bodily harm. Furthermore, even if it were determined that Michael's actions amounted to an "assault," Michael's actual injury did not arise from his own conduct toward B.J., but from B.J.'s unanticipated reaction to Michael's conduct.

{¶32} Based upon the foregoing, we conclude that there remain genuine issues of material fact in this case which render a grant of summary judgment inappropriate. Specifically, it is not clear from the record whether B.J.'s employment status at the time of the altercation brought him under the purview of the insurance agreement as an "insured" therefore triggering the *Thompson* analysis. Moreover, if B.J. is considered to be an "insured" under the Policy, there still remains an issue of fact as to whether B.J.'s use of force against Michael was a legitimate act of self-defense.

{¶33} For the reasons stated above, we find that the trial court erred when it determined that CSU was entitled to summary judgment as a matter of law. Accordingly, the five assignments of error as they pertain to the trial court's grant of summary judgment are sustained. The judgment of the trial court is reversed and the cause remanded for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**ROGERS and PRESTON, J.J., concur.**

**/jlr**